**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**MIDLAND DIVISION**

| | | |
|---|---|---|
| TEXAS CAMPAIGN FOR THE ENVIRONMENT, ENVIRONMENT AMERICA, INC. d/b/a ENVIRONMENT TEXAS, and SIERRA CLUB, | ) ) ) ) ) | CIVIL ACTION NO. 7:21-cv-00048-DC |
| Plaintiffs | ) ) ) | CONSENT DECREE |
| v. | ) ) | |
| DCP OPERATING COMPANY, L.P., | ) ) | |
| Defendant. | ) ) ) ) | |

Date lodged in Court:  <u>5/27/2022</u>

Date entered by Court:  <u>             </u>

## CONSENT DECREE AND ORDER

WHEREAS, Texas Campaign for the Environment, Environment America, Inc. d/b/a Environment Texas, and Sierra Club ("Plaintiffs") brought this action (the "Complaint") against DCP Operating Company, L.P. ("Defendant") (collectively, the "Parties") under the federal Clean Air Act (the "Act"), 42 U.S.C. § 7401, et seq., for declaratory and injunctive relief and assessment of civil penalties for certain alleged violations of the Act and its implementing regulations at the Goldsmith Gas Plant (the "Plant") located in Ector County, Texas;

WHEREAS, Defendant is the current owner and operator of the Plant and was the owner and operator at the time of the actions alleged by the Plaintiffs to have violated the Act;

WHEREAS, Defendant denies Plaintiffs' allegations and maintain that they have been and remain in compliance with the Act and are not liable for civil penalties or injunctive relief, and nothing herein shall constitute an admission of liability;

WHEREAS, the Parties desire to settle all matters by this Consent Decree and avoid the costs, delay, and uncertainty of litigation;

WHEREAS, the Parties agree that the settlement of this action through this Consent Decree without further litigation is in the public interest, and is a fair, reasonable, and appropriate means of resolving the matter;

WHEREAS, the Parties further anticipate that actions taken by the Defendant, consistent with this Consent Decree, will result in significant reductions of air pollutant emissions from the Plant;

WHEREAS, pursuant to 42 U.S.C. § 7604(c)(3) of the Clean Air Act ("Act"), this Consent Decree is being forwarded to the United States Department of Justice and to the United States

1

Environmental Protection Agency ("EPA") for the statutorily-mandated forty-five (45) day review period; and

WHEREAS, the Parties consent to the entry of this Consent Decree without trial of any issues.

NOW, THEREFORE, it is hereby ORDERED AND DECREED as follows:

## I.    JURISDICTION, VENUE, AND APPLICABILITY

1.    This Court has jurisdiction over the Parties to and the subject matter of this action under Section 304 of the Act, 42 U.S.C. § 7604 and under 28 U.S.C. §§ 1331.

2.    Venue is proper in this Judicial District under Section 304(c) of the Act, 42 U.S.C. § 7604(c), and under 28 U.S.C. §§ 1391.

3.    The Parties consent to entry of this Consent Decree without further notice.

4.    Upon the Date of Entry, the provisions of this Consent Decree shall apply to, be binding upon, and inure to the benefit of the Parties.  Further, the specific provisions of this Consent Decree applicable to Plaintiffs and Defendant respectively, shall apply to and be binding upon the successors in interest or assigns of Plaintiffs and Defendant, respectively.

5.    In the event Defendant proposes to sell or transfer, in whole or in part, its legal or equitable interest in the Plant before the termination of this Consent Decree, or if Defendant's operational responsibilities for the Plant are transferred or assigned in whole or in part before the termination of this Consent Decree (a "Transfer"), Defendant shall notify Plaintiffs of such proposed sale, transfer or assignment, shall advise the proposed purchaser, successor-in-interest, assignee or transferee of the existence of this Consent Decree, and shall obtain the purchaser's, successor-in-interest's, assignee's or transferee's agreement to comply with the terms hereof that apply to Defendant.

6.      In the event of a Transfer by Defendant, Defendant shall file a motion to modify this Consent Decree with the Court to make the terms and conditions of this Consent Decree applicable to the purchaser, successor-in-interest, assignee, or transferee.

## II.    DEFINITIONS

7.      Unless otherwise expressly provided herein, terms used in this Consent Decree that are defined in the Clean Air Act, 42 U.S.C. § 7401, *et seq.*, or regulations implementing the Clean Air Act, shall have the meaning set forth in the Clean Air Act or those regulations.

8.      Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

(a) "Clean Air Act," "CAA," or "Act" means the federal Clean Air Act, 42 U.S.C. §§ 7401-7671q, and its implementing regulations.

(b) "Date of Entry" shall mean the date this Consent Decree is approved or signed by the United States District Court Judge.

(c) "Date of Lodging" shall mean the date this Consent Decree is filed for lodging with the Clerk of the Court for the United States District Court for the Western District of Texas.

(d) "Day" shall mean, unless otherwise specified, calendar day.

(e) "Emissions Event" shall have the meaning set forth in 30 Tex. Admin. Code § 101.1(28) at the Date of Lodging.

(f) "Excess Emissions," for the purposes of this Consent Decree only, shall mean the quantity of sulfur dioxide ("$SO_2$") and/or hydrogen sulfide ("$H_2S$") emitted to the atmosphere from any emission point at the Plant in connection with an Emissions Event. For the limited purpose of calculating the stipulated penalties, Excess

Emissions shall include emissions of $SO_2$ and/or $H_2S$ even if those emissions may be eligible for an affirmative defense. However, Defendant is not barred from asserting an affirmative defense in connection with these emissions for any other purpose.

(g)  "Parties" shall have the meaning set forth in the recitals.

(h) "EPA" shall mean the United States Environmental Protection Agency.

(i)  "TCEQ" shall mean the Texas Commission on Environmental Quality.

(j)  "Acid Gas Flare" shall mean emission point number FL-01 at the Plant.

(k) "Residual Compression Flare" shall mean emission point number FL-03 at the Plant.

(l)  "5# Flare" shall mean emission point number FL-05 at the Plant.

(m) "SRU" shall mean Sulfur Recovery Unit.

(n) "Term" of the Consent Decree shall mean the period of time between the Date of Lodging and the date the Consent Decree is terminated in accordance with Section XV (Termination).

### III.   INJUNCTIVE RELIEF

9.    On or before the Date of Lodging, Defendant agrees to undertake actions to reduce Excess Emissions at the Plant. These actions include:

(a)  Install and upgrade switches, programmable logic controllers (PLCs), control panels, shutoff valves and other components of the Burner Management System (BMS) for the Cold Bed Adsorption (CBA), Regenerator Reheater, Reheater #1 and Reheater #2, with the goal of shortening startup time and reducing flaring.

(b)  Integrate SRU components into the updated BMS system to automate mixing ratios of fuel gas, hydrogen sulfide, sulfur dioxide, and oxygen, with the goal of maintaining a more stable flame and preventing upsets and shutdowns.

4

(c)   Replace seal pan for tray #20 and other internal components of the Amine Still with the goal of correcting tower upsets.

(d)   Install and program back pressure control to stabilize the operation of the tower.

(e)   Reprogram the flare pressure control valve, with the goal of preventing future damage of the amine still.

(f)   Replace damaged catalyst in the SRU beds 1 and 2.

(g)   Upgrade acid gas inlet control valve with re-sized valve programmed to improve accuracy for acid gas flow to the SRU.

(h)   Replace the fuel gas flow meter to the main burner of the SRU.

(i)   Reconfigure SRU fire eye piping to improve flame detection capabilities and accuracy of flame measurement.

(j)   Install a supplemental fuel source to the SRU with the goal of preventing flame-outs caused by low BTU acid gas.

(k)   Install new meter run to accurately measure the flow of the supplemental fuel.

(l)   Install a flame temperature transmitter to operate flow of the supplemental fuel.

(m)   Re-tune the combustion air control valve to improve control of the air flow.

(n)   Re-route the liquid return line from the SRU sump to prevent re-entrainment into the acid gas stream with the goal of preventing damage to catalyst.

(o)   Implement Nitrogen quench process in lieu of acid gas quench process to extinguish flame and prevent runaway reactions.

(p)   Conduct field tests to confirm adequate and improved SRU performance with system modifications.

## IV.    REPORTING

10.    Beginning on October 1, 2022, and semiannually thereafter until termination, no later than April 1st and October 1st, Defendant shall submit to Plaintiffs a written report including the following information:

(a)    $H_2S$ results of one monthly sample of gas routed to the 5# Flare, the Acid Gas Flare, and the Residual Compression Flare,

(b)    Monthly flowmeter data showing total flow volumes to 5# Flare, the Acid Gas Flare, and the Residual Compression Flare, and

(c)    Calculated monthly British thermal unit content to the 5# Flare, the Acid Gas Flare, and the Residual Compression Flare.

11.    Notwithstanding any other provision of this Consent Decree, Defendant shall notify Plaintiffs of any permit application to increase allowable, or permitted, $SO_2$ or $H_2S$ emissions from any emission point at the Plant during the Term of the Consent Decree in excess of the Plant's allowable or permitted $SO_2$ and $H_2S$ emissions as of the Date of Lodging.  Such notification shall be made at least 5 days prior to submittal of a permit application seeking such increase or 5 days prior to commencement of the project, whichever occurs first.

12.    Plaintiffs shall not initiate or participate in any judicial or administrative proceeding, or submit written comments, challenging any permit changes necessary for Defendant to effectuate the commitments in paragraph 9 unless such permit changes include emissions increases.

13.    Notwithstanding any other provision of the Consent Decree, Plaintiffs retain the right to challenge any application to increase permitted $SO_2$ and/or $H_2S$ emissions from the Plant during the Term of the Consent Decree.

## V.    CIVIL PENALTY

14.    Not later than 30 days after the Date of Entry of the Consent Decree, Defendant shall pay a civil penalty to the U.S. Department of Treasury in the amount of $150,000 in settlement of the alleged violations that are the subject of this action.

15.    The Defendants may not deduct any penalties paid under this Decree pursuant to this Section or Section VII (Stipulated Penalties) in calculating their federal, state, or local income tax.

## VI.    MITIGATION

16.    Not later than 30 days after the Date of Entry, Defendant will deposit in the Court's registry the sum of $500,000 (the "Mitigation Payment"). The Mitigation Payment shall be used to fund Mitigation project(s) to be selected by the Plaintiffs, with the consent of Defendant, which shall not be unreasonably withheld (the "Mitigation Project").  The Mitigation Project may be selected from the pre-approved Supplemental Environmental Projects listed by the Texas Commission on Environmental Quality, or may be another project that mitigates the harms of air pollution, improves air quality and/or public health in Ector County, Texas.   The selected Mitigation Project(s) may not directly benefit or be used at the Goldsmith Gas Plant or any other DCP facilities. No more than $50,000 of the Mitigation Payment shall be payable directly to Texas Campaign for the Environment for reasonable staffing costs associated with development and implementation of the selected Mitigation Project(s).

17.    The funds will be expensed upon joint Motion of the Parties. If the Parties fail to file such motion within three years of entry of this Decree, the Mitigation Payment shall be forwarded from the Court's registry to the U.S. Department of Treasury as a civil penalty.

## VII.   STIPULATED PENALTIES

18.     Defendant shall be liable for stipulated penalties for Excess Emissions each year, as follows:

(a)     Beginning on January 1, 2022 and continuing on an annual basis thereafter until December 31, 2026, without demand Defendant will pay a stipulated penalty to the United States Treasury for each ton of Excess Emissions of $SO_2$ and/or pound of $H_2S$ emitted above the following thresholds in accordance with the following formula:

| Calendar Year | Pollutant | Penalty |
|---|---|---|
| 2022 | $SO_2$ | $925 per ton for Excess Emissions above 150 tons and up to and including 300 tons.<br>$1425 per ton for Excess Emissions above 300 tons. |
| 2022 | $H_2S$ | $5.00 per pound for Excess Emissions above 1 ton and up to and including 3 tons.<br>$7.50 per pound for Excess Emissions above 3 tons. |
| 2023 | $SO_2$ | $925 per ton for Excess Emissions above 125 tons and up to and including 300 tons.<br>$1425 per ton for Excess Emissions above 300 tons. |
| 2023 | $H_2S$ | $5.00 per pound for Excess Emissions above 1 ton and up to and including 3 tons.<br>$7.50 per pound for Excess Emissions above 3 tons. |
| 2024 | $SO_2$ | $925 per ton for Excess Emissions above 100 tons and up to and including 300 tons.<br>$1425 per ton for Excess Emissions above 300 tons. |
| 2024 | $H_2S$ | $5.00 per pound for Excess Emissions above 1 ton and up to and including 3 tons.<br>$7.50 per pound for Excess Emissions above 3 tons. |
| 2025 | $SO_2$ | $925 per ton for Excess Emissions above 100 tons and up to and including 300 tons.<br>$1425 per ton for Excess Emissions above 300 tons. |
| 2025 | $H_2S$ | $5.00 per pound for Excess Emissions above 1 ton and up to and including 3 tons.<br>$7.50 per pound for Excess Emissions above 3 tons. |
| 2026 | $SO_2$ | $925 per ton for Excess Emissions above 100 tons and up to and including 300 tons.<br>$1425 per ton for Excess Emissions above 300 tons. |

| 2026 | H2S | $5.00 per pound for Excess Emissions above 1 ton and up to and including 3 tons. $7.50 per pound for Excess Emissions above 3 tons. |
|------|-----|-----|

Penalties for Excess Emissions from Emission Event(s) that begin in one calendar year and end in the following calendar year will be paid for the calendar year in which the Emission Event(s) began.

(b)     Stipulated penalties shall be due on or before May 1 of the year following any such Excess Emissions, such that the first annual payment of stipulated penalties will be paid, if owed, no earlier than May 1, 2023 covering Excess Emissions for calendar year 2022 and the last payment due no earlier than May 1, 2027 covering Excess Emissions for calendar year 2026.

(c)     Defendant shall be entitled to subtract, from any annual stipulated penalty payment it has incurred, the portion of any TCEQ penalty that was actually paid to TCEQ or any payment for a Supplemental Environmental Project ("SEP") made in lieu of penalties to the TCEQ that was actually paid to a SEP, in each case, since Defendant's last stipulated penalty payment, if any, or the Date of Entry if no previous stipulated penalty payment was due and owing, and that was attributable to the same violation(s) of the same emission limit(s) for which Defendant has already paid, or is currently required to pay, a stipulated payment pursuant to this Consent Decree.

(d)     The maximum stipulated penalty payments owed pursuant to paragraph 18(a) for both $SO_2$ and $H_2S$, combined, shall be capped at $500,000 for any single calendar year.

## VIII.   NOTIFICATIONS AND RECORDKEEPING

19.     All notifications, submittals, reports, and other information required by this Consent Decree shall be directed to the individuals at the addresses specified below, unless those

9

individuals or their successors give notice of a change to the other Parties in writing by U.S. Mail and email.

> For the Plaintiffs:
>
> Colin Cox
>
> Environmental Integrity Project
>
> 1206 San Antonio St.
>
> Austin, TX 78704
>
> (832) 316-0580
>
> colincox@environmentalintegrity.org
>
> For Defendant:
>
> Joshua Frank
>
> Baker Botts L.L.P.
>
> 700 K Street, N.W.
>
> Washington, DC 20001
>
> (202) 639-7748
>
> joshua.frank@bakerbotts.com

## IX.    FORCE MAJEURE

20.    A "Force Majeure Event" for the purposes of the Consent Decree is defined as any event arising from causes beyond the reasonable control of Defendant or any entity controlled by Defendant (including, without limitation, Defendant's contractors and subcontractors, and any entity in active participation or concert with Defendant with respect to the obligations to be undertaken by Defendant pursuant to this Consent Decree), that delays or prevents, or can reasonably be anticipated to delay or prevent, compliance with the obligations of the Consent Decree, despite Defendant's best efforts to meet such deadlines.  The requirement that Defendant exercise "best efforts" to meet the deadlines includes using best efforts to avoid any Force Majeure

Event before it occurs, and to use best efforts to mitigate the effects of any Force Majeure Event as it is occurring, and after it has occurred, such that any delay is minimized to the greatest extent possible.

21.     Without limitation, unanticipated or increased costs or changed financial circumstances shall not constitute a Force Majeure Event.  A Force Majeure Event shall not relieve Defendant of liability for stipulated penalties under Paragraph 18.

## X.     EFFECT OF SETTLEMENT AND RESERVATION OF RIGHTS

22.     This Consent Decree represents full and final settlement among the Parties.  This Consent Decree resolves, and Plaintiffs and Plaintiffs' corporate affiliates release and waive, any and all civil claims, causes of action, demands, actions and/or rights of action, that Plaintiffs or Plaintiffs' corporate affiliates may have against Defendant or Defendant's corporate affiliates for violations of the Clean Air Act at the Plant occurring on and before the Date of Entry of this Consent Decree by the Court.  The Parties further agree that the Consent Decree resolves, and Plaintiffs and Plaintiffs' corporate affiliates release and waive, any and all civil penalties and injunctive relief related to alleged violations of the Clean Air Act regulatory provisions alleged in the Complaint that may occur from the date the Complaint was filed through the date of termination of the Consent Decree.  Notwithstanding termination of this Consent Decree pursuant to Section XV, the requirements of this paragraph are permanent and shall survive termination of this Consent Decree.

23.     Plaintiffs and Plaintiffs' corporate affiliates shall not, and shall not encourage or support others to,: (a) fund any third-party litigation involving any claims settled, released or waived by this Consent Decree; or (b) submit formal comments or testimony to an administrative agency opposing permits or approvals necessary for Defendant to comply with the Consent

Decree.   Notwithstanding termination of this Consent Decree pursuant to Section XV, the requirements of this paragraph are permanent and shall survive termination of this Consent Decree.

24.    Notwithstanding the foregoing, Plaintiffs reserve all legal and equitable remedies available to enforce the terms of this Consent Decree.  Further, nothing in this Consent Decree shall restrict or control Plaintiffs' comments, litigation, or any other activity related to state or federal implementation plans not directly relating to the Plant.

25.    Nothing in this Consent Decree shall be construed to limit the rights of the United States to obtain penalties or injunctive relief under the Act or implementing regulations, or under other federal laws, regulations, or permit conditions.  Defendant reserves all legal and equitable remedies available against any such action by the United States.

26.    The failure of any Party to comply with any requirement contained in this Consent Decree will not excuse the obligation to comply with other requirements contained herein.

## XI.    DISPUTE RESOLUTION

27.    The dispute resolution procedure provided by this Section may be used to resolve all disputes arising under this Consent Decree, provided that the Party invoking such procedure has first made a good faith attempt to resolve the matter with the other Party.  The provisions of this Section XI shall be the sole and exclusive mechanism to seek relief from the Court to resolve disputes arising under or with respect to this Consent Decree.

28.    The dispute resolution procedure required herein may be invoked by one Party giving written notice to the other Party advising of a dispute pursuant to this Section.  The notice shall describe the nature of the dispute and shall state the noticing Party's position with regard to such dispute.

29.     In the event one Party asserts that any other Party is in violation of any requirement of this Consent Decree, the asserting Party will provide written notice of such asserted violation to the other Party.  Before pursuing action to enforce any asserted violation, the noticing Party will provide the other Party with an opportunity to remedy such asserted violation within 30 days of receiving written notice or, in the case of a claimed breach which cannot be reasonably remedied within a thirty (30) day period, an opportunity to take reasonable action to remedy the claimed violation within such thirty (30) day period and, thereafter, diligently complete the activities necessary to remedy the claimed breach.

30.     If the asserted violation is not cured within the applicable time period, the asserting Party may seek relief from the Court.

31.     The Court shall decide all disputes pursuant to applicable principles of law for resolving such disputes.  This Court shall not draw any inferences nor establish any presumptions adverse to either Party as a result of invocation of this Section or the Parties' inability to reach agreement.

32.     No party shall be entitled to money damages for any breach of this Consent Decree. Specific performance shall be the sole remedy available for any breach of this Consent Decree.

## XII.    ATTORNEYS FEES AND COSTS

33.     Pursuant to 42 U.S.C. § 7604(d), not later than 30 days after the Court's entry of this Consent Decree,  Defendants shall pay up to $100,000 for costs of litigation, inclusive of Plaintiffs' reasonable attorney and expert witness fees, to Plaintiff's counsel by bank draft made payable to "Environmental Integrity Project."

34.     Nothing in this Consent Decree shall constitute an admission by any Party as to liability for costs or fees from any other Party.

## XIII.   MODIFICATION

35.     The terms of this Consent Decree may be modified only by a subsequent written agreement signed by Plaintiffs and Defendant. Where the modification constitutes a material change to any term of this Consent Decree, it shall be effective only upon approval by the Court.

## XIV.   RETENTION OF JURISDICTION

36.     Until termination of this Consent Decree, this Court shall retain jurisdiction over both the subject matter of this Consent Decree and the Parties to this Consent Decree to enforce the terms and conditions of this Consent Decree.  Following termination, the Court shall retain jurisdiction to enforce the provisions and obligations set forth herein that are permanent.

## XV.     TERMINATION

37.     Stipulated Penalties under this Consent Decree will terminate on December 31, 2026, such that Stipulated Penalties for calendar year 2026 will be payable, if at all, by May 1, 2027.

38.     This Consent Decree terminates on December 31, 2027.

39.     Termination of this Consent Decree shall not affect any matter expressly set forth in this Consent Decree that is to survive as an agreement among the Parties.

## XVI.   LODGING AND ENTRY OF DECREE

40.     The Parties agree to cooperate in good faith in order to obtain the Court's review and entry of this Consent Decree.

41.     Pursuant to 42 U.S.C. § 7604(c)(3), this Consent Decree will be lodged with the Court and simultaneously presented to the United States for its review and comment for a period of 45 days.  After the review period has elapsed, the Consent Decree may be entered by the Court.

If the Consent Decree is not entered by the Court, the Parties shall retain all rights they had in this litigation before the Date of Lodging.

42.     The Parties agree to cooperate in good faith in order to expeditiously obtain EPA and United States Attorney General (Department of Justice, or "DOJ") review and District Court approval.  In the event that DOJ or EPA comments upon the terms of this Consent Decree, the Parties agree to discuss such comments to support the entry of the Consent Decree or to make any revisions to the Consent Decree as the Parties determine may be reasonable and appropriate to support entry of the Consent Decree.

## XVII.  SIGNATORIES

43.     Each undersigned representative of a Party to this Consent Decree certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind such Party to this Consent Decree.

44.     The Parties hereby agree not to oppose entry of this Consent Decree by this Court or challenge any provision of this Consent Decree.

## XVIII. COUNTERPARTS

45.     This Consent Decree may be signed in counterparts.

THE UNDERSIGNED Parties enter into this Consent Decree and submit it to this Court for approval and entry.

SO ORDERED:

_____

UNITED STATES DISTRICT JUDGE

Dated this ___ day of _____, 2022.

FOR PLAINTIFF TEXAS CAMPAIGN FOR THE ENVIRONMENT:

Date: 5/17/2022

Robin Schneider

Executive Director
Texas Campaign for the Environment
P.O. Box 42278
Austin, TX 78704

FOR PLAINTIFF ENVIRONMENT AMERICA, INC. d/b/a ENVIRONMENT TEXAS:

Date:

Luke Metzger

Executive Director
Environment Texas
200 East 30th Street
Austin, TX 78705

FOR PLAINTIFF SIERRA CLUB:

Date:

Neil Carman

Clean Air Program Director
Sierra Club – Lone Star Chapter
P.O. Box 4998
Austin, TX 78765

16

FOR PLAINTIFF TEXAS CAMPAIGN FOR THE ENVIRONMENT:


_____          Date: _____

Robin Schneider

Executive Director
Texas Campaign for the Environment
P.O. Box 42278
Austin, TX 78704


FOR PLAINTIFF ENVIRONMENT AMERICA, INC. d/b/a ENVIRONMENT TEXAS:


_____          Date: 5/19/22

Luke Metzger

Executive Director
Environment Texas
200 East 30th Street
Austin, TX 78705


FOR PLAINTIFF SIERRA CLUB:


_____          Date: _____

Neil Carman

Clean Air Program Director
Sierra Club – Lone Star Chapter
P.O. Box 4998
Austin, TX 78765

16

FOR PLAINTIFF TEXAS CAMPAIGN FOR THE ENVIRONMENT:


_____          Date: _____

Robin Schneider

Executive Director
Texas Campaign for the Environment
P.O. Box 42278
Austin, TX 78704


FOR PLAINTIFF ENVIRONMENT AMERICA, INC. d/b/a ENVIRONMENT TEXAS:


_____          Date: _____

Luke Metzger

Executive Director
Environment Texas
200 East 30th Street
Austin, TX 78705


FOR PLAINTIFF SIERRA CLUB:


_____          Date: May 17, 2022

Neil Carman

Clean Air Program Director
Sierra Club – Lone Star Chapter
P.O. Box 4998
Austin, TX 78765

16

FOR DEFENDANT DCP OPERATING COMPANY, LP:


Date: 5/18/22

George R. Green

Group Vice President and General Counsel
DCP Operating Company, LP
6900 E. Layton Ave., Suite 900
Denver, Colorado 80237-3658